IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel.** | ) | |
| **EVAN GRIFFITH,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 06 C 5371 |
| | ) | |
| **DONALD HULICK,** | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Evan Griffith, a thirty-nine year old man who has served
over twenty-three years of a natural life sentence for a crime he
committed in 1985, two months after his sixteenth birthday,
brings a petition for a writ of habeas corpus pursuant to 28
U.S.C. § 2254.  Mr. Griffith is incarcerated at the Menard
Correctional Center in Menard, Illinois, where Donald Hulick is
the warden.  For the reasons discussed below, I grant Mr.
Griffith's petition.

I.

BACKGROUND

A. Facts

Because factual determinations made by state courts are
presumed to be correct for the purpose of federal habeas
petitions, *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003), I
base my account of the material facts on *People v. Griffith*, 334

Ill.App.3d 98 (Ill. App. Ct. 2002) ("*Griffith*"), in which the Illinois Appellate Court--the highest state court to decide Mr. Griffith's claims on the merits--upheld his conviction and sentence.  Where helpful, I also include additional, uncontroverted facts gleaned from my review of the trial record.

On May 11, 1985, sixteen-year-old Evan Griffith, who had been homeless for several months after running away from brutal abuse in his parents' home, awoke to find forty-nine-year-old Leroi Shanks masturbating him.  Shanks was a former neighbor of Mr. Griffith's, and Mr. Griffith occasionally stayed with him when he needed a place to sleep for the night, as he had on the night preceding Shanks's death.

It was not the first time Shanks had engaged in sexual contact with Mr. Griffith.  On at least one previous occasion, Shanks had fondled and performed oral sex on him.  Mr. Griffith did not invite or want a sexual relationship with Shanks, and he had told Shanks as much.  Desperate and alone, however, he let Shanks touch him in exchange for a place to sleep.

On the morning of May 11, 1985, however, Mr. Griffith rebuffed Shanks.  Shanks tried to force Mr. Griffith to perform oral sex on Shanks but Mr. Griffith managed to push Shanks away. Shanks became angry.  He cursed at Mr. Griffith and raised his fist, but he did not strike Mr. Griffith.  Shanks left the

apartment, telling Mr. Griffith to be gone by the time he returned.

After Shanks left, Mr. Griffith began drinking a bottle of wine that Shanks kept on his dresser. He thought about how Shanks had hurt him and decided to hurt Shanks in return by stealing the money Mr. Griffith believed was in a safe Shanks kept in a closet. Mr. Griffith found a hammer and chisel, which he used to chisel a hole into the top of the safe. It took about an hour. When he opened the safe, he found it was empty.

As Mr. Griffith was preparing to leave the apartment, Shanks came home. Mr. Griffith panicked. He thought that if Shanks saw that he had broken into the safe, he would call the police, or worse, try to hurt Mr. Griffith in some way.

As Shanks approached, Mr. Griffith grabbed the hammer he had used to break open the safe and hit Shanks with it to try and "knock him out" so that he could escape. But Shanks remained conscious. Mr. Griffith hit Shanks with the hammer a few more times. Mr. Griffith then stabbed Shanks.

As Shanks lay on the floor, Mr. Griffith gathered his belongings to leave. He saw that Shanks had a wallet in his back pocket. Mr. Griffith took the wallet out of Shanks's pocket, pulled out $124 dollars, dropped the wallet on the floor, and left. Other than the money in Shanks's wallet and a prescription pill bottle belonging to Shanks (but apparently containing Mr.

Griffith's own pills), Mr. Griffith did not take any property from Shanks's person or apartment.

Shanks later died of his wounds.  Mr. Griffith was arrested on May 22, 1985 in Milwaukee, Wisconsin.

Mr. Griffith originally pled guilty to Shanks's murder and was sentenced in 1986 to 35 years' imprisonment.  In 1997, however, his guilty plea was found not voluntary, his conviction reversed, and a trial ordered.

In 1999--more than 14 years after the events at issue--Mr. Griffith went to trial in the Circuit Court of Cook County, charged with intentional or knowing first degree murder, felony murder, and armed robbery.  Following a six-day trial, the jury convicted Mr. Griffith of felony murder and armed robbery.[1]  The trial court sentenced him to life in prison without the possibility of parole.

1. The Trial

The State's evidence consisted largely of Mr. Griffith's own statements to acquaintances and authorities in the days and weeks following the killing.  Three of the State's witnesses testified that Mr. Griffith had told them that he killed Shanks for money.

Mr. Griffith testified in his own defense.  He did not deny

---

[1]The armed robbery conviction was later merged into the felony murder conviction.

killing Shanks.  He asserted, however, that his violence against Shanks was driven by his fear that Shanks would kill him, hurt him, or sexually abuse him upon discovering that he had broken open Shanks's safe, not by an intent to rob Shanks.

Mr. Griffith testified that between the ages of eight and fifteen, he suffered persistent physical and psychological abuse at the hands of his father, as well as sexual abuse at the hands of his older brother.  Mr. Griffith recounted that he was born in Belize, where he spent an uneventful early childhood in the care of his grandparents, until his parents––who had moved to the United States when Mr. Griffith was a toddler--sent for him to join them when Mr. Griffith was about eight.  Beginning several months after his arrival at his parents' home in Pennsylvania, and continuing until Mr. Griffith left the family home for the last time shortly before his sixteenth birthday, Mr. Griffith suffered repeated abuse.

Mr. Griffith testified that at times, his father beat him several times a week for violating the strict rules he imposed, such as requiring Mr. Griffith to return home within minutes after school was dismissed for the day.  Over time, Mr. Griffith testified, the beatings escalated in severity, and were particularly violent when his father was drunk.  Once, Mr. Griffith's father broke his own hand striking Mr. Griffith.  Mr. Griffith was frequently left bruised and bleeding as a result of

his father's blows, which were sometimes meted out with the aid of a special whipping device his father fashioned out of a fan belt and a pipe.  Mr. Griffith recalled one occasion on which his parents locked him in a basement bathroom alone for an entire day while they were at work.

While living at his parents' house, Mr. Griffith also suffered sexual abuse by his older brother.  When Mr. Griffith told his parents about his brother's abuse, Mr. Griffith was beaten by his father.  At trial, several of Mr. Griffith's family members, as well as a local police officer called to testify on Mr. Griffith's behalf, corroborated various aspects of Mr. Griffith's account of his abuse.

Regarding the events of May 11, 1985, Mr. Griffith testified that he "blacked out" for a portion of his altercation with Shanks and has no memory of most of it.  He recalls, however, that as Shanks approached Mr. Griffith, who was kneeling in front of the open safe, Shanks had a look in his eye that reminded Mr. Griffith of how his father would look when he beat him.

Mr. Griffith said he recalls hitting Shanks several times with the hammer.  After that, however, his memory fails.  His next recollection is of "coming to" when he felt a sharp pain in his little finger and looked down to find that he had cut himself with a heavy-bladed kitchen knife.  He realized then that he had been stabbing Shanks.

Mr. Griffith testified that it did not occur to him to take money from Shanks's wallet until after Shanks lay wounded on the floor, when Mr. Griffith saw the wallet hanging out of Shanks's back pocket.

Dr. Robert Chapman, an expert in forensic psychiatry, testified on Mr. Griffith's behalf. Dr. Chapman stated that Mr. Griffith suffered from several chronic mental disorders at the time he killed Shanks. Among these was post traumatic stress disorder (PTSD) caused by Mr. Griffith's history of physical and sexual abuse. One symptom of Mr. Griffith's PTSD was that it caused him to experience a heightened "fight or flight" response to stressful triggers bearing a resemblance to Mr. Griffith's past trauma. Dr. Chapman opined that Mr. Griffith's PTSD caused him to experience more of a threat than an ordinary individual would perceive in similar circumstances.

Dr. Chapman also testified that Mr. Griffith suffered from acute stress disorder (ASD). Dr. Chapman explained that ASD is similar to PTSD, but that it is an acute reaction to a particularly stressful event, with symptoms that are short-lived and severe. These symptoms can include amnesia and a "dissociative reaction," in which behavior can become automatic and repetitive. Dr. Chapman opined that Mr. Griffith's ASD explained the excessive and overly aggressive nature of Mr.

Griffith's response to Shanks's unexpected return to the apartment, as well as Mr. Griffith's blackout.

The State presented its own psychiatric experts in rebuttal. The thrust of their collective testimony was to challenge Dr. Chapman's opinion that Mr. Griffith suffered from PTSD in May of 1985, and to assert that even if Mr. Griffith had PTSD, it would not have caused him to lose contact with reality or cause him to mistake Shanks for his father or brother.

More than half of Mr. Griffith's trial was devoted to evidence of his mental state at the time he stabbed Shanks, including evidence of his chronic and acute mental disorders. In its closing in rebuttal arguments, the prosecution repeatedly told the jury that it should disregard that evidence, or "throw it out the window" because it was "completely irrelevant" to the charge of felony murder. Laura Morask, the lead prosecutor, summarized: "You can take the last five days and just throw it away. There is no abuse, there is no post traumatic stress disorder. None of that is applicable to felony murder. You may not consider it. You may, may, may not."

The trial court instructed the jury to begin its deliberations on the murder counts by considering first the charge of felony murder. The court instructed:

> To sustain the charge of felony murder, Type A, the
> State must prove the following propositions: First that
> the defendant performed the acts which caused the death

of Leroi Shanks; and second, when the defendant did so,
he was committing the offense of armed robbery.

If you find from your consideration of all the evidence
that each one of these proposition has been proved
beyond a reasonable doubt, you should find the
defendant guilty of felony murder, Type A, and your
deliberations should end.

Shortly less than five hours later, the jury returned a
verdict of guilty of felony murder.


2. Prosecutorial Misconduct

At several points during the trial, as well as at the
close of the proceedings, Mr. Griffith moved for a mistrial
based on prosecutorial misconduct.  One of Mr. Griffith's
primary complaints was that the prosecution improperly
introduced, then deliberately misused, evidence that Mr.
Griffith had been convicted of murder while he was
incarcerated for killing Shanks.  Mr. Griffith also claimed
that the prosecution inflamed the jury's passions during
closing and rebuttal arguments, misstated the evidence, and
improperly encouraged the jury to ignore evidence of Mr.
Griffith's mental state, including evidence of his history
of abuse.

The trial court denied Mr. Griffith's motions for
mistrial.  Mr. Griffith presented these claims on appeal,
and the Appellate Court acknowledged and roundly criticized
the prosecution's misconduct, discussing several examples at

length.  The Appellate Court's discussion merits
reproduction in whole:

> In 1990, while incarcerated for Shanks's murder,
> Griffith killed a fellow inmate, James Jones. Griffith
> was convicted of the murder in 1992, the jury rejecting
> his claim of self-defense. The prosecution in this case
> sought to ask Griffith and the defense expert witnesses
> about the 1990 incident. Prosecutor Laura Morask
> contended the questions were necessary to negate the
> defense theory that Griffith suffered from PTSD and/or
> ASD when he killed Shanks. She claimed she had a good
> faith basis for using the 1990 evidence because the
> State's expert, Dr. Stipes, had examined the 1990
> records and found them relevant to the PTSD defense.

> When the trial court expressed concern about the
> potential prejudice of the 1990 killing, the State
> offered to "sanitize" the evidence. The prosecutor
> promised:

>> "We don't have to call it a murder. We could call
>> it the second confrontation, a confrontation that
>> occurred in 1990 and a stabbing. It doesn't have
>> to be called a murder. We don't have to go into
>> that the victim died, what his sentence was, or
>> any of that * * * We don't have to put in the fact
>> that he was in prison when the stabbing occurred."

> Thus assured, the trial court agreed to allow evidence
> of the 1990 stabbing.

> It turned out that Dr. Stipes had never seen records of
> the 1990 incident, nor did he feel the need to know
> anything about them. The record persuades us that the
> prosecutor had no intention of limiting evidence of the

1990 killing to the question of whether Griffith had PTSD in 1985. Instead, the 1990 killing was used to convince the jury Griffith was a violent and dangerous man who had a propensity to kill with a knife.

Propensity evidence "overpersuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving of punishment." People v. Lindgren, 79 Ill.2d 129, 137, 37 Ill.Dec. 348, 402 N.E.2d 238 (1980). See also People v. Nunley, 271 Ill.App.3d 427, 208 Ill.Dec. 93, 648 N.E.2d 1015 (1995) (reversible error where State's true purpose for offering evidence of defendant's other violent acts was to portray him as a man of bad character).

Improper character argument was injected into the trial during the cross-examination of witnesses and during the State's closing argument. Objections were made, some sustained, some overruled. It didn't matter. Nothing stopped this prosecutor.

For example, the questions asked during cross-examination of Griffith:

> "Q: (by Morask) When you were confronted by Mr. James Jones in 1990 in Pontiac, Illinois, you stabbed and killed him, is that correct?
>
> * * *
>
> Q: Both times, you walk away from the encounter alive and well and the victims don't walk away at all, they are dead, right?"

So much for not going into the fact that Jones died or that the incident took place in prison.

The promise not to mention the word "murder" was kept until Morask cross-examined Dr. Chapman:

> "Q: Now, you testified in another proceeding with respect to both the first murder and the second murder, is that correct?"

After Griffith's objection was sustained, Morask apologized for using the word "murder." During her final argument she said: "[Dr. Chapman] couldn't remember whether or not he testified in a prior proceeding about the 1990 murder."

Responding to Griffith's concern that the cross-examination of Dr. Chapman would elicit the 1992 conviction, the trial court ruled: "So, the jury will not be allowed to know there was a finding of guilty."

Morask asked Dr. Chapman:

> "Q: And you were hired to prepare a report for something called mitigation, correct?
>
> A: Yes.
>
> Q: Mitigation is basically to find something good to say about someone?
>
> * * *
>
> Q: In order to lessen their sentence?"

The jury was not to know Griffith had been sentenced to death in 1992 for the Jones murder. When challenging defense expert Dr. James Garbarino's credentials, Morask asked:

> "Q: You became involved in this case through the Capital Resource Center, is that correct?

A: I believe so, yes.

Q: Weren't you retained in October of 1988 by the Capital Resource Center in the case of the People versus Bobby Simms, a guy who had committed a double murder after a home invasion?

* * *

Q: In any event, Capital Resource Center deals with trying to get a prisoner not to get the death penalty?"

The prosecutor's motion to bar Dr. Garbarino's testimony was granted. In final argument she asked: "What happened to Dr. Garbarino?"

During her final argument, Morask continued her assault on Griffith's character:

"You know by this guy's account, people just happen to fall on to his knife. Everything is an accident.

* * *

Remember what he said about 1990, he stuck his arm out and James Jones just happened to fall onto the knife.

* * *

This guy is like a walking barbecue tongs. Now, he would be a great tool if it wasn't so tragic. It would be worth a lot of money. You would put him near your barbeque and hot dogs and hamburgers just fly on and get poked by him. And that's what he is trying to tell you. Everybody that just walks by, falls on to his knife.

* * *

That's what this defendant does. Explosions of rage. Explosions of violence."

The prosecution's final argument contained improper references to defense counsel-the defense would give Griffith a "license to kill" and the defense argument was "the reason Shakespeare said let's kill all the lawyers"-and improperly attacked defense witnesses: "Dr. Chapman was ridiculous. For $10,000, the guy couldn't remember his reports * * * He couldn't answer a straight yes or no in 50 words * * * Because he is getting paid by the word;" "You know. Officer Richards, the Barney Fife of Yeadon, this guy was a joke." <u>See People v. Moss</u>, 205 Ill. 2d 139, 170 (2001), (Morask's reference to defendant's expert witnesses as "cash for trash doctors" described as "completely unacceptable").

It would unduly prolong this Opinion to set out the other instances of prosecutorial excess.

My own review of the record reveals that these examples are indeed illustrative rather than exhaustive. Moreover, reviewing the proceedings in their entirety, I conclude that the effect of the prosecution's cumulative impropriety was decidedly greater than is palpable from the isolated examples the Appellate Court highlighted. Indeed, the prosecution's hostile tone crescendoes noticeably over the course of the trial, reaching what comes across as a frenzied pitch at the height of Morask's rebuttal.

Amid cries of "for Christ's sake!" Morask derided several of Mr. Griffith's witnesses as "ridiculous," called

one a "joke," and referred to another as "pathetic" and a "slime ball" who the defense "threw [] up there to make you sick." She implored the jury to ignore the evidence of Mr. Griffith's mental state, insisting at one point:

> You know, they don't hand out knives to all sexually abused children, okay, to give them a license to kill. Why don't they?  Because it doesn't give you a license to kill.  Throughout this case, they want you to believe that this defendant should have a license to kill. [Objection overruled] Anyone in their childhood has a licence to kill.  First they try APD (sic), then ATSD (sic), acute stress disorder, and they want him – they want you to think he is somehow some poor, you know, child.... He's been tortured and abused.  So I guess, you know, we should just let him go. [Objection overruled] And forget about the fact of that guy who died such a brutal death.
>
> You know, he's like a grenade in a baby carriage, this defendant.  You -- [Objection overruled] –- you walk up to a baby carriage, you see the little baby, you think, "oh, my God, look at that cute little baby.  Goochi, goochi, goochi, goochi." And he goes "boom" and explodes in your face.  That's what this defendant does.

(Tr. K-121-122)


3. The Appeals

Mr. Griffith appealed his conviction and sentence, alleging a number of errors, including several attributable to prosecutorial misconduct.  Despite the extended discussion of prosecutorial misconduct reproduced above, the Appellate Court declined to reverse Mr. Griffith's conviction on that ground, holding: "Because we conclude that no rational jury could have

found the defendant not guilty of felony murder, we affirm his conviction despite the intentional and systematic misconduct of the prosecutor." *Griffith*, 334 Ill.App.3d at 119.

The Appellate Court also rejected the remainder of Mr. Griffith's claims, some after discussion and others summarily. The Appellate Court rejected Mr. Griffith's challenge to the trial court's use of a non-IPI murder instruction, which directed the jury to consider felony murder first, and to end its deliberations if it found the defendant guilty. The Appellate Court found no error but held that, "the command to stop deliberating on issues the jury has heard so much about could be confusing and should be avoided." *Griffith*, at 115.

The Appellate Court summarily dismissed Mr. Griffith's claims relating to evidentiary issues, including the exclusion of one of his expert witnesses and limitations on the testimony of several lay witnesses, which Mr. Griffith argued corroborated the basis for his defense. The Appellate Court held that the alleged errors related only to the intentional or knowing murder counts, which the jury did not reach. *Id.*, at 116-117.

After his unsuccessful appeal in the Illinois Appellate Court, Mr. Griffith pursued additional appeals and ultimately exhausted his state court remedies.

Mr. Griffith now seeks a writ of habeas corpus. In his petition, Mr. Griffith raises five separate claims. The first is

that he was denied the right to present a defense, due process,

and a fair trial by a pattern of prosecutorial deceit and

misconduct.  Because I find that this claim has merit, I do not

address his remaining claims for relief.[2]

## II.

## DISCUSSION

A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act

("AEDPA"), federal courts may not grant a state prisoner habeas

relief unless the state court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal

---

[2]Mr. Griffith's remaining claims are: <u>second</u>, that he was
denied the right to present a defense, a fair trial, due process,
and equal protection by the trial court's felony murder jury
instruction; <u>third</u>, that he was denied due process and a fair
trial when the trial court: (a) improperly admitted other crimes
evidence; (b) failed to enforce its own ruling and the
prosecutor's pledges that the state would make only limited use
of that evidence; © denied defense counsel's motion for a
mistrial after the prosecutor referred to the Capital Resource
Center; (d) excluded the testimony of Dr. James Garbarino, a
defense expert witness; (e) limited the testimony of defense
witnesses James Banks, Alice Roberts, and Halvert Roberts; (f)
denied defense counsel's request to question potential jurors
regarding their opinion of psychiatrists and psychologists during
voir dire; (g) required Mr. Griffith to testify first during the
defense's case in chief; (h) permitted the state but not the
defense to question a state expert witness about Dr. Garbarino's
conclusions; and (I) admonished defense counsel that he was
objecting too much; <u>fourth</u>, that his inculpatory statements
should have been suppressed because no concerned adult was
present and Mr. Griffith was not informed of his rights under the
Vienna Convention; and <u>fifth</u>, that he was denied due process by
the cumulative effect of the prosecutor's and trial judge's
errors.

law, as determined by the Supreme Court of the United
States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence
presented in the State court proceeding.

28 U.S.C. § 2254(d); *Smiley v. Thurmer*, 542 F.3d 574, at 580 (7th

Cir. 2008). If either of these conditions is met, a federal

court must then conduct an independent analysis under 28 U.S.C.

§ 2254(a) to determine whether habeas relief is appropriate.

*Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir. 2003). Under

§ 2254(a), a federal court may issue "a writ of habeas corpus on

behalf of a person in custody pursuant to the judgment of a State

court only on the ground that he is in custody in violation of

the Constitution or laws or treaties of the United States." 28

U.S.C. § 2254(a).


B. Prosecutorial Misconduct

Mr. Griffith raises a number of constitutional claims based

on prosecutorial misconduct. The State does not dispute that Mr.

Griffith has consistently raised prosecutorial misconduct claims

throughout his appeals, but it does contend that certain of his

arguments present legal theories that were not fairly presented

before the state courts and therefore are procedurally defaulted.

The State is correct that because a state prisoner is required to

exhaust state remedies before seeking federal habeas relief, I

may only consider claims that the state courts had a full and fair opportunity to review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 843-45 (1999).

It is clear that Mr. Griffith consistently framed his prosecutorial misconduct claims in constitutional terms throughout "one complete round of the State's established appellate review process." *O'Sullivan* at 845. The State's narrow objection is that Mr. Griffith now cites, *inter alia*, *Estes v. Texas*, 381 U.S. 532 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966), which the State argues represent a "drastic shift" in the constitutional theories Mr. Griffith presented in the state proceedings. The State asserts that these cases stand for the proposition that certain procedures are so likely to cause prejudice that they can be deemed inherently lacking in due process, while the arguments Mr. Griffith presented to the state courts sought to prove actual due process violations, without reliance on presumption.

Even assuming that the State correctly characterizes Mr. Griffith's earlier and later arguments, the distinction it draws reveals nothing more than a slight variation in Mr. Griffith's legal theory, not a new claim. The shift--if indeed there has been one--falls well within Mr. Griffith's ability to "reformulate somewhat" his state claims. *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992). As the *Verdin* court held,

"exhaustion requires only that the substance of the federal claim be fairly presented." *Id.*, at 1474; *see also Brannigan v. U.S.* 249 F.3d 584, 588 (7th Cir. 2001)(in collateral proceedings, "new legal arguments about the same events do not amount to a new claim").  Mr. Griffith has consistently argued that pervasive prosecutorial misconduct, specifically including the prosecution's misuse of evidence relating to the 1990 crime and its improper closing and rebuttal arguments, deprived him of his constitutional right to due process. None of the theories he now advances in support of those claims has been procedurally defaulted.

Having established that these claims are properly before me, I turn to the standard I must apply in reviewing them.  While the Appellate Court did not explicitly address the constitutional dimension of Mr. Griffith's prosecutorial misconduct claims, it recognized that his allegations asserted a violation of due process and resolved the claims on substantive grounds. Accordingly, its disposition of these claims must be considered a decision on the merits.  *Muth v. Frank*, 412 F.3d 808, 815 (7th Cir. 2005) (adjudication on the merits is the resolution of a claim on non-procedural grounds).  Therefore, under AEDPA, I may not grant relief unless I find that the Appellate Court's decision is contrary to, or involved an unreasonable application

of, clearly established federal law as determined by the Supreme Court. *Id.,* at 816, n. 7; 28 U.S.C. § 2254(d)(1).

This task is complicated by the fact that the Appellate Court neither cited to federal authority (indeed, it was not required to, *Early v. Packer*, 537 U.S. 3, 8 (2002)), nor articulated the standard or standards it applied in disposing of Mr. Griffith's constitutional claims. In particular, as the parties have observed, the Appellate Court failed to specify whether it upheld Mr. Griffith's conviction, despite the systematic and deliberate prosecutorial misconduct it found, because it determined that the misconduct fell short of constitutional error, or because it determined that any error was harmless.[3]

The parties agree that prosecutorial misconduct claims are generally subject to the standard set forth in *Darden v. Wainwright*, 477 U.S. 168 (1986), and *Donnelly v. DeChristoforo*,

---

[3] I note that the Appellate Court's citation to *People v. Carter*, 297 Ill.App.3d 1028, 1037, 697 N.E.2d 895 (Ill.App.Ct. 1998)--the only case it cites in support of its holding--does not help to identify the basis for the holding. The cited portion of *Carter* reads: "There is no litmus test that allows us to scientifically measure the impact of impropriety on a jury. At times, when we engage in a weighing process, we conclude the errors did not prejudice the defendant. Reversal, then, is not required. *See People v. Davis*, 285 Ill. App. 3d 1039, 1044, 221 Ill.Dec. 287, 675 N.E.2d 194 (1996). In other cases, confidence in the outcome is shaken. Strong evidence or not, '...a fair trial, in all its stages, is a fundamental requirement in a criminal prosecution....' *People v. Rega*, 271 Ill. App. 3d 17, 24, 207 Ill.Dec. 674, 648 N.E.2d 130 (1995)."

416 U.S. 637 (1974), both of which specifically addressed prosecutorial misconduct during closing argument. Under *Darden*, a prosecutor's conduct amounts to constitutional error only if it "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181, *quoting Donnelly*, 416 U.S. at 643. The Seventh Circuit has held that the *Darden* test involves a two-prong analysis, in which the first prong examines whether the conduct is improper and the second prong examines whether the defendant was prejudiced. *Bartlett v. Battaglia*, 453 F.3d 796 (7th Cir. 2006)(*citing Ruvalcaba v. Chandler*, 416 F.3d 555, 565 (7th Cir. 2005). Based on the *Darden* court's characterization of its own holding, I understand both of these prongs to relate to the question of whether a constitutional error was made, not whether the error, if any, was harmless.[4]

_____

[4]The *Darden* court expressly stated, "*We do not decide the claim of prosecutorial misconduct on the ground that it was harmless error.* In our view of the case, that issue is not presented. Rather, we agree with the holding of every court that has addressed the issue, that the prosecutorial argument, in the context of the facts and circumstances of this case, did not render petitioner's trial unfair-*i.e.*, that *it was not constitutional error.*" *Darden*, 477 U.S. at 183, n. 13 (emphasis added). The conceptual difference between the prejudice prong of the *Darden* test for constitutional error, which applies the "fundamental fairness" standard of the due process clause, and the harmless error test for trial-type constitutional errors, which applies the *Kotteakos* "substantial and injurious effect" standard, is rather obscure. In *Greer v. Miller*, 483 U.S. 756, (1987), a case also involving prosecutorial misconduct, the Supreme Court noted that the *Chapman* harmless error standard is more demanding than the due process "fundamental fairness"

Mr. Griffith contends that his claims are additionally governed by *Mooney v. Holohan*, 294 U.S. 103 (1935), *Miller v. Pate*, 386 U.S. 1 (1967) and *Brady v. Maryland*, 373 U.S. 83 (1973), which addressed prosecutorial misconduct relating to the presentation of evidence, and that the Appellate Court's decision was contrary to these decisions. Mr. Griffith also argues that the Appellate Court's decision was contrary to *Sheppard* and *Estes*, which he asserts mandate reversal of his conviction regardless of any showing of prejudice because the State employed procedures so inherently prejudicial that violation of due process can be inferred.

Mr. Griffith argues that the Appellate Court failed to undertake the proper *Darden/Donnelly* inquiry in arriving at its conclusion that "no rational jury could have found the defendant not guilty of felony murder." Mr. Griffith argues that the Appellate Court erroneously reached this conclusion based on the weight of the evidence alone, without regard to other factors bearing on fairness. Mr. Griffith further contends that Appellate Court's focus on what a rational jury would have done is contrary to clearly established federal law because it set forth a standard that is substantially different from the one

---

standard; I am not aware of any case, however, that compares the *Kotteakos* standard with the due process "fundamental fairness" standard, nor have the parties addressed this issue.

articulated in *Darden* and *Donnelly*.[5]  *See Williams v. Taylor*, 529 U.S. 362, 405 (2000).  Finally, Mr. Griffith argues that because the Appellate Court found misconduct that included deliberate deception calculated to win the admission of otherwise inadmissible evidence, the Appellate Court's failure to consider *Mooney*, *Miller*, and *Brady* was contrary to clearly established federal law.

The State responds that the Appellate Court is presumed to "know and follow the law," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002), and that regardless of the standard it used, its conclusion is consistent with *Darden* and *Donnelly*.  The State argues that the Appellate Court's "no rational jury" determination merely reflects its finding, consistent with *Darden* and *Donnelly*, that despite substantial prosecutorial misconduct, Mr. Griffith suffered no prejudice.  The State further argues that the Appellate Court's lengthy discussion of the prosecutor's misconduct, including its acknowledgment of the potential for prejudice to Mr. Griffith, belies Mr. Griffith's assertion that the Appellate Court considered only the evidence of his guilt.

---

[5]Mr. Griffith also cites *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993), arguing that under *Sullivan*, a court must decide "not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error."  *Id*.  I agree.

There is no question the *Darden/Donnelly* standard provides
the general framework for prosecutorial misconduct claims, but I
agree that based on the Appellate Court's explicit findings of
deliberate and systematic prosecutorial misconduct involving the
use of deception to obtain the admission of highly prejudicial
(and, ultimately, marginally relevant) evidence, its analysis
must also be consistent with *Mooney* and *Miller*, both of which
involved the prosecution's misuse of evidence.  Moreover, the
*Brady* court recognized the fundamental principle of *Mooney* as
"avoidance of an unfair trial to the accused."  *Brady*, 373 U.S.
at 87.

The emphasis of *Darden*, *Donnelly*, *Mooney*, and *Brady* on the
impact of prosecutorial misconduct on the *fairness* of the trial,
as opposed to merely its outcome, cannot be squared with the
Appellate Court's terse disposition of Mr. Griffith's claims.
Not only did the Appellate Court fail to refer to any of these
cases, its only reference to the principle of fairness was when
it observed that the prosecutor's unprofessional conduct "called
into question the State's commitment to fair and just enforcement
of the law."  *Griffith*, 334 Ill.App.3d at 119.[6]  This undermines,

_____

[6]This distinguishes the present case from *Stanley v.
Bartley*, 465 F.3d 810 (7th Cir. 2006).  In that case, the state
appellate court repeatedly recited the correct constitutional
standard ("a reasonable probability that...the outcome of the
trial would have been different") but occasionally stated that
the petitioner had to show that "the outcome would have been
different" – omitting the "reasonable probability" portion. The

rather than supports, the court's ultimate holding.  Moreover, the Appellate Court failed to cite any element, other than the weight of the evidence against Mr. Griffith, that would mitigate the effects of the unfairness it acknowledged.  Accordingly, I find that the Appellate Court's disposition of Mr. Griffith's prosecutorial misconduct claims was contrary to clearly established federal law as determined by the Supreme Court.

Turning now to an independent review of Mr. Griffith's claims, *Stanley v. Bartley*, 465 F.3d 810, 813 (7th Cir. 2006), I conclude that under the correct standard, the prosecution's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, at 181 (citation omitted).  There is no question that the prosecutor's conduct was improper.  My review of the proceedings, including pre- and post-trial hearings, as well as the trial itself, confirms many times over the Appellate Court's finding of repeated, deliberate prosecutorial misconduct.

Under Seventh Circuit precedent, a showing of constitutional error under *Darden* requires that Mr. Griffith demonstrate

_____

Seventh Circuit held that because the state court was "entitled to the benefit of the doubt," its occasional use of the shorter phrase was more likely to result from imprecise wording than application of an incorrect standard.  Here, not only did the Appellate Court decline to recite the applicable constitutional standard and fail to specify the standard it actually applied, it did not express its holding in terms that can reasonably be construed as applying even an imprecise articulation of the correct standard.

prejudice as a result of the misconduct. *Bartlett*, 453 F.3d at 802. While *Darden* suggests six factors to consider, I agree with the parties that these factors are neither exhaustive (as Mr. Griffith points out), nor required in every case (as the State responds). The *Darden* factors are particularly relevant to misconduct in closing arguments, as was at issue in *Darden, Donnelly* and *Bartlett*. In this case, however, the prosecutor's closing argument, with its inflammatory assault on Mr. Griffith's character, his witnesses, and his counsel, was buttressed by her previous misconduct over the course of the trial, and especially by her treatment of the evidence relating to Mr. Griffith's conviction for the 1990 crime.[7]

Morask's dehumanizing litany during rebuttal, which compared Mr. Griffith to a "deranged Energizer bunny," a "walking barbecue tongs," and finally, a "grenade in a baby carriage," was leveraged by her misuse of the 1990 crime evidence, the admission of which she had obtained on false premises, and her use of which far exceeded even those premises. Moreover, her repeated closing references to a "license to kill," coupled with her exaggerated speculation about the violent acts Mr. Griffith would commit in

---

[7]I note that Griffith's conviction for the 1990 crime is the subject of a separate habeas petition. All of the prosecution's eyewitnesses in that case, No. 91 CF 15, have recanted their trial testimony, testifying at an evidentiary hearing on February 21, 2002, that their statements incriminating Griffith were false.

the future (such as killing all car mechanics), smack of the suggestion that the jury would be to blame for future crimes if it credited Mr. Griffith's defense and declined to convict him of first degree murder.  *See Bates v. Bell*, 402 F.3d 635, 642 (6th Cir. 2005) (reversing death sentence where prosecution compared defendant to a "rabid dog" and told jurors they would be responsible for future deaths by permitting him to live).  Of course, this inflammatory rhetoric also gained force from the highly prejudicial evidence relating to the 1990 crime.

Under these circumstances, the *Darden* six factor test is insufficient to measure the prejudice Mr. Griffith suffered as a result of the prosecutor's misconduct.[8]  Here, the prosecutor's toxic rebuttal argument fed off of her misuse of improper propensity evidence.  The effect was inherently prejudicial, since it posed "an unacceptable risk...of impermissible factors coming into play."  *U.S. v. Mannie* 509 F.3d 851, 856 (7th Cir.

_____

[8]Although for the reasons expressed, I do not rely solely on the *Darden* factors in arriving at my conclusion of prejudice, I note that various of the *Darden* factors militate in favor of prejudice. For example, the first factor relates to the misstatement or manipulation of evidence.  Morask's misuse of the 1990 evidence certainly falls into this category; and while I find it unnecessary to address them here, I note that both Ms. Morask and her partner, Ms. Bigane, also made several factual misstatements in closing and rebuttal argument.  The fourth factor–whether the misconduct was remedied through adequate instructions–also weighs in Mr. Griffith's favor, as I discuss below.  And the fifth factor–whether the defense had an opportunity to rebut–also militates in favor of Mr. Griffith, since several of the prosecution's most inflammatory statements were made during rebuttal argument.

2007)(*indirectly quoting Estelle v. Williams*, 425 U.S. 501, 505
(1976), and *citing, inter alia*, *Sheppard v. Maxwell*, 384 U.S. 333
(1966)).[9]

The trial court's general cautionary instruction reminding
the jurors that attorney argument is not evidence was
insufficient to defuse this prejudice. *See Mannie*, 509 F.3d at
856. Indeed, in a separate instruction, the judge explicitly
instructed the jury that it could consider evidence relating to
the 1990 crime for the purpose of determining Mr. Griffith's
intent, despite the ultimate lack of any evidence that it was
relevant for that purpose. This may well have amplified, rather
than diminished, the effect of the prosecutor's closing and
rebuttal arguments, which invited the jury to draw improper
inferences about Mr. Griffith's character based on the 1990
crime.

For these reasons, I find that the prosecutor's misconduct,
including at least her improper closing arguments, her deliberate
deception to win the admission of highly prejudicial evidence,
and her subsequent misuse of that evidence during the trial "so
infected the trial with unfairness as to make the resulting
conviction a denial of due process." *Darden*, 477 U.S. at 181.

---

[9]I agree with Mr. Griffith that the Seventh Circuit's
citation to *Sheppard* in *Mannie* demonstrates the erroneousness of
the State's argument that *Sheppard* is inapplicable outside the
context of prejudicial pretrial publicity.

Taken together, this conduct deprived Mr. Griffith of a fair trial.[10]  Still, this does not end my inquiry.

C. Harmless Error Analysis

In *Chapman v. California*, 386 U.S. 18 (1967), the Supreme Court rejected the notion that the mere showing of constitutional error mandates the reversal of a conviction.  The *Chapman* court held that where the constitutional error is "harmless beyond a reasonable doubt," the conviction will stand.  Federal courts applied the *Chapman* standard to claims on both direct and collateral review until 1993, when the Court decided *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

In *Brecht*, the Court analyzed the difference it has historically recognized between constitutional errors of the "trial" type, which are generally capable of harmless error review, and those of the "structural" type, which require automatic reversal because they defy analysis by harmless error standards.  *Id.* at 629-30.  The Court held that federal courts analyzing claims of trial-type constitutional error on collateral

_____

[10]I need not decide whether any of the prosecutor's acts, taken individually, amounted to constitutional error.  As the Seventh Circuit recently reaffirmed, "'prejudice may be based on the cumulative effect of multiple errors.  Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient.'" *Malone v. Walls,* 538 F.3d 744, 762 (7th Cir. 2008)(*citing Hough v. Anderson,* 272 F.3d 878, 891 n.3 (7th Cir. 2001)).

review (such as habeas petitions under 28 U.S.C § 2254) must apply the harmless error standard announced in *Kotteakos v. United States*, 328 U.S. 750 (1946), rather than the more onerous *Chapman* standard. Under *Kotteakos*, a conviction will stand, despite a finding of constitutional error, unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776.

In a footnote, however, the *Brecht* court offered an escape hatch from *Kotteakos* to habeas petitioners in "unusual" cases, which the Court characterized as those in which "a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." *Brecht*, 507 U.S. at 638, n. 9. The Seventh Circuit has construed *Brecht*'s footnote nine to mean that some errors, although of the trial type generally subject to harmless error review, may nonetheless require automatic reversal. *U.S. v. Harbin*, 250 F.3d 532, 545 (7th Cir. 2001).

Mr. Griffith urges me to apply footnote nine of *Brecht* to hold that in light of the systematic and deliberate nature of the misconduct in this case, coupled with the improper evidence of the 1990 crime, habeas relief is warranted without the need for harmless error analysis.

The State responds, first, that the *Teague* nonretroactivity doctrine prevents the application of *Brecht*. This argument is meritless, since Mr. Griffith's substantive claims arise not under *Brecht* but under *Darden*, *Donnelly*, *Mooney*, *Miller*, and *Brady*, all of which were firmly established constitutional law well before his conviction became final. The State next argues that this case is not the "unusual" one described in *Brecht* footnote nine, and that even if it were, the constitutional errors Mr. Griffith alleges would still be subject to harmless error review under the *Chapman* standard, citing Judge Schroeder's concurring opinion in *Hardnett v. Marshall*, 25 F.3d 875, 882 (9th Cir. 1994)(Schroeder, J., concurring).

Taking the State's last argument first, Judge Schroeder's opinion is inconsistent with the Seventh Circuit's discussion in *Harbin*. Because the *Harbin* court determined that the error in that case was structural, it did not reach the question of how to determine whether a trial-type error fits the footnote nine description of one that is "deliberate and especially egregious ... or combined with a pattern of prosecutorial misconduct." Nevertheless, *Harbin* was clear that an error that does meet the footnote nine criteria requires reversal. *Harbin*, at 545 ("even some 'trial' errors, then, may require automatic reversal").

Another circuit has noted that "in evaluating whether 'Footnote Nine' error has occurred, 'the key consideration is

whether the integrity of the proceeding was so infected that the entire trial was unfair.'" *Phillips v. Woodford*, 267 F.3d 966, 986 n. 14 (9th Cir. 2001)(*citing Hardnett v. Marshall*, 25 F.3d 875, 879 (9th Cir. 1994). For the reasons discussed in the previous section, I find that this is such a case.

The prosecution's claim during closing and rebuttal arguments that Mr. Griffith "kill[ed] everyone" who "happen[ed] to fall on to his knife," and its comparison of Mr. Griffith to a grenade, a defective mechanical toy, and a barbecue tongs, crystallized its efforts throughout the trial to portray Mr. Griffith as an inhuman killing machine. As explained above, the potency of these images was bolstered by the deliberate misuse of the 1990 crime evidence. The prosecution's dogged focus on the improper theme of Mr. Griffith's "propensity to kill with a knife," *Griffith*, at 117, shaped the course of the proceedings and permeated the entire atmosphere of the trial. Such a climate is inherently and fundamentally unfair. "It is axiomatic in our system of justice that an individual is entitled to a fair trial- not a perfect one. Nevertheless, the distance between the concepts of fair and perfect cannot be so great as to render the former meaningless." *Mannie*, 509 F.3d at 857. To excuse the prosecutor's lies to the court, misuse of evidence, and other misconduct in this case would indeed render meaningless the principle that every defendant has a right to a fair trial.

III.

CONCLUSION

For the reasons discussed above, Mr. Griffith's petition for a writ of habeas corpus is granted.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated:  November 12, 2008